Filed 9/24/13  P. v. Landa CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>v.<br><br>RIGOBERTO SANTOS LANDA et al.,<br><br>  Defendants and Appellants. | A136427, A136584, A136836<br><br>(Sonoma County<br>Super. Ct. No. SCR616787) |

A felony complaint charged codefendants Rigoberto Santos Landa, Jesse Franklin Wolfe, and Charles Kenneth Rogers, Jr. (collectively, defendants) with various charges related to the sale and possession of marijuana.  Following a hearing where the trial court denied defendants' motion to suppress evidence (Pen. Code, § 1538.5), Landa and Rogers pleaded no contest to possessing concentrated cannabis (Health & Saf. Code, § 11357), and Wolfe pleaded no contest to possession of marijuana for sale (Health & Saf. Code, § 11359).  Defendants appeal and contend that the lower court erred in denying their motions to suppress evidence.  We affirm the judgments as to all three defendants.

**BACKGROUND**

On May 1, 2012, a felony complaint was filed charging Wolfe and Rogers in count 1 with the sale or transportation of marijuana (Health & Saf. Code, § 11360, subd. (a)), and charging Wolfe, Rogers, and Landa in count 2 with possession of marijuana for sale (Health & Saf. Code, § 11359).  The complaint also alleged a prior-prison-term

1

enhancement against each defendant (Pen. Code, § 667.5, subd. (b)).  Subsequently, on June 7, 2012, the complaint was amended to add a third charge of conspiracy to sell marijuana (Pen. Cod, § 182, subd. (a)(1); Health & Saf. Code, § 11359) against all three defendants.  Defendants pleaded not guilty and denied the enhancement allegation.

On May 30, 2012, Rogers moved to suppress evidence, and Wolfe and Landa later joined his motion.  Defendants argued that the evidence against them was uncovered as a result of an unlawful search.

Judge Kenneth Gnoss held the preliminary hearing and the motion to suppress on June 28, 2012.  Detective Jason Lucas, assigned to the Sonoma County Sheriff's Office Narcotics Unit, testified.  He reported that he was on duty around 4:30 p.m. on March 29, 2012, and that he and Detective Brandon Van Camp were filling their unmarked truck with gas at a Chevron station in the City of Cloverdale (Cloverdale).  Lucas noticed two rental vehicles.  One was a silver Jeep backed into a parking stall; a person, later identified as Rogers, was sitting alone in the driver's seat.  The other rental vehicle was a dark-colored Chevrolet, which was parked by the gas pumps.  Lucas noticed these cars because of their positioning.  After Van Camp finished pumping gas into the truck, Lucas told Van Camp to drive across the street to permit them to continue watching the activity at the Chevron station.

Van Camp parked the truck across the street and Van Camp and Lucas continued to watch the gas station.  Lucas spotted a male go over to the Chevrolet and then walk away.  A few minutes later, the Chevrolet drove away.  When asked why vehicles parked legally in the gas station appeared suspicious, Lucas answered that it was because the two rental vehicles were from the same company and "one [vehicle was] not occupied at a gas pump, and [the other] vehicle [was] backed into a stall with a subject directly facing towards that unoccupied vehicle."  He emphasized that he saw them there for over 25 minutes.

Lucas contacted Officer John Camara, a K-9 officer with the Cloverdale Police Department, and asked him to make consensual contact with the occupants in "suspicious" vehicles in a gas station.  Camara had extensive training in marijuana

2

investigation. He had attended several California Narcotics Officer Association classes and participated in over 200 hours of training with his canine partner. Lucas explained to Camara that there were a couple of rental vehicles in the gas station that he believed might be involved in some type of trafficking. Lucas admitted that at that point he had "no evidence" of any crime being committed, but insisted that "[r]ental vehicles are very common in this area, and used to transport marijuana." He acknowledged that rental cars also were frequently used in this area by tourists.

Lucas saw the Chevrolet return to the Chevron station, and then leave again. As they watched the Jeep, which remained at the gas station, a black Chevrolet Silverado pickup pulled into the station's parking lot. The pickup truck passed the Jeep, stopped, backed up, and pulled forward into the parking space directly next to the Jeep. Lucas saw a male, later identified as Landa, walk from the driver's side of the truck to the middle of the two vehicles.

After being contacted by Lucas, Camara, who was in uniform, drove his marked police car to the Chevron gas station. It was still daylight as he pulled into the station, and he spotted the silver Jeep backed into a parking spot at the station. Adjacent to the Jeep, he noticed the dark-colored Chevrolet pickup parked facing forward. The rear passenger door of the Jeep was open and the side doors of the truck were open. Camara did not see anyone inside the truck. In the front seats of the Jeep, Camara saw Rogers on the driver's side and a person, later identified as Wolfe, on the passenger's side. Landa was leaning into the passenger's side of the vehicle. At that point in time, Camara stated that defendants' behavior was not suspicious.

Camara testified that he parked his vehicle about 10 to 15 feet away from defendants' vehicles, perpendicular to the Jeep and truck.[1] The "nose" of Camara's vehicle "was just up about to the middle of the Jeep . . . ." The side driver's door of the officer's car, which faced the Jeep and truck, "was probably right in the middle of both vehicles." He maintained that there was an empty parking space next to the Jeep and

---

[1] His estimate of the distance changed to 20 to 25 feet on cross-examination.

"[t]here was plenty of room to get out." He acknowledged that the Jeep would have had to make "a slight turn" to get around his vehicle. When testifying, Lucas agreed that Camara had left sufficient space for the Jeep to exit the station. He maintained that the Jeep did not have to go around Camara's vehicle but could simply "turn left" to exit the parking lot."

When asked whether he intended to park his vehicle to prevent the Jeep and pickup truck from leaving, Camara answered, "No." He testified that he parked in a manner that permitted the Jeep to leave, and he believed the pickup could have backed around him. He maintained that he did not park parallel to defendants' vehicle because of his concern for his own safety; he would have lost sight of defendants if he parked in the open space next to the Jeep.

While in his car, Camara saw a cardboard box on the ground behind the passenger door of the pickup truck. While in his car, he could not see what was inside the box. Camara exited his car but his canine remained in the car and played no role in the investigation. As Camara was leaving his car, he "could see marijuana in open view there sitting in a cardboard box." The box was between the two vehicles and Landa was near the box. Camara stated that the box was between 20 to 25 feet away and he could see the marijuana sticking up on the top. The flaps of the box were open on three sides, and tape was on the flaps. The photograph admitted into evidence as an exhibit showed that the marijuana was partially underneath the truck. Camara insisted that when he saw the box it was between the vehicles and not partially underneath one of them. Neither Camara nor Lucas saw anyone move the box.

After Camara observed the marijuana in clear plastic bags in the box, he pulled his service handgun out and ordered defendants to place their hands in the air. He estimated that he drew his gun about one or two seconds after leaving his car. Defendants complied with Camara's command to put their hands in the air.

Camara then radioed for backup. He admitted that defendants' only suspicious behavior was having the box of marijuana. He also acknowledged that he did not know whether the marijuana was medical marijuana.

4

Lucas reported that he saw Camara arrive at the Chevron station and get out of his vehicle. He had wanted Camara to make consensual contact with defendants and was "a little bit surprised" that he had taken out his gun. Lucas said to Van Camp, "Does he have his gun out?" Van Camp responded that he was not certain but believed Camara had his gun out. Lucas agreed that he wrote in his report that when Camara "got out of his vehicle, [he] immediately drew his gun." At the hearing, Lucas insisted that, although Camara pulled the gun out "[r]elatively quickly," it was "after he was already out of his vehicle." He then admitted that he could not tell whether Camara was drawing the gun from his holster while he was getting out of the car.

Van Camp drove to the gas station. Once at the gas station, Lucas saw Rogers seated on the driver's side in the Jeep and Wolfe in the passenger seat. Lucas indicated that he had "a vague recollection" of Landa standing between the vehicles. Lucas went over to the Jeep and opened the door on the driver's side. After a couple of seconds, he detected the odor of fresh marijuana. He asked Rogers whether he had weapons on him and then asked him to exit the vehicle. He handcuffed Rogers and searched him. He found $3,900 in cash in his pants pocket.

At some point, Lucas moved between the Jeep and truck. He then saw the open cardboard box with four bags of bud marijuana. It was later determined that the marijuana weighed under four pounds.

Lucas searched the Jeep and Chevrolet pickup truck. He found cell phones and Van Camp looked at text messages on the phones. Van Camp told Lucas that some of the messages appeared to be related to marijuana trafficking. One of the messages "talked about hundred showerheads." Lucas opined that the term "showerheads" meant pounds of marijuana. He explained, "It's very common that in any drug trade, in trafficking, people will call various types of drugs, they'll code it as tacos or burritos or showerheads or units, other terms, rather than just pounds."

Lucas advised Wolfe of his rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436. Wolfe told Lucas that "he was here to sell the guy in the Jeep weed." Lucas believed that Wolfe was telling him "that this was just a portion of a deal that was

5

supposed to be occurring in a larger deal . . . ." Lucas maintained that it was difficult for Wolfe to talk because he was either really nervous or under the influence.

Lucas explained that he believed the marijuana in the box was possessed for the purpose of sales, and that it had been transported for the purpose of sales. He based this opinion on the following: "Based on the totality of the circumstances that I've described, as well as the text messages within the defendants' cell phones that I reviewed, the statements of [Wolfe], and my knowledge of the area of that marijuana is frequently obtained from parties outside of the area for purposes of sale." He noted that the packaging was typical. He added that an additional reason for believing that the marijuana was for sale was the amount of money Rogers had.

At the end of the hearing, Judge Gnoss stated that the court needed "to look at the objective factors to determine whether or not this was a consensual encounter or a detention under the circumstances." The court found that the initial contact occurred at 4:55 p.m., during daylight. The court observed that "the contact took place in a public parking lot at an open business at the Chevron gas station in Cloverdale. [¶] According to the testimony of the officer, his vehicle was positioned not blocking the vehicles of any of the defendants." Judge Gnoss noted that Camara was in uniform and he "assume[d] he had his gun on and everything of that nature." He added that the canine remained in the vehicle and was not part of the investigation. Judge Gnoss observed that the court in *People v. Perez* (1989) 211 Cal.App.3d 1492 (*Perez*) held that an officer could park his or her vehicle "in front of the defendant's vehicle, as long as there's room left for the defendant to leave."

Judge Gnoss explained: "The court finds that based on the testimony that the officer did not have any contact, didn't order the defendants to do anything prior to getting out of his vehicle, once he does get out of the vehicle, he observes the marijuana, the brown box and marijuana in plain view. [¶] Therefore, his observations in plain view allow for him to detain the individuals and conduct further investigation."

Judge Gnoss denied defendants' motions to suppress and found that there was a consensual encounter, not a detention, until the officer spotted the marijuana in plain

6

view. The court held defendants to answer to counts 1 and 2, and found the evidence was insufficient as to count 3 and the prior prison terms.

On July 9, 2012, an information was filed charging defendants with transporting marijuana in count 1 (Health & Saf. Code, § 11360, subd. (a)), and with possessing marijuana for purposes of sale in count two (Health & Saf. Code, § 11359). The information also charged all three defendants with a prior-prison-term enhancement (Pen. Code, § 667.5, subd. (b)). Defendants pleaded not guilty and denied the enhancement allegation.

On August 13, 2012, Rogers filed a motion to set aside the information (Pen. Code, § 995) on the basis that the court erroneously denied the motion to suppress evidence. Wolfe and Landa later joined the motion to dismiss.

Judge Julie Conger held a hearing on the motion to dismiss on August 23, 2012. She found that Judge Gnoss's findings at the preliminary hearing were supported by substantial evidence. She stated that Judge Gnoss made the implied finding that Officer Camara saw the marijuana before pulling his gun. Judge Gnoss also found that the police car was not blocking defendants' vehicles. Judge Conger commented that the testimony was that the officer's vehicle did not completely block defendants' vehicles. Judge Conger stated that Judge Gnoss found that once Camara got out of the vehicle and observed the marijuana in plain view, he was permitted to detain the individuals and conduct further investigation. Judge Conger declared that she could not substitute her own judgment regarding Judge Gnoss's analysis of the credibility of the witnesses. Judge Conger thus denied defendants' motion to dismiss.

After a voluntary waiver of rights and an amendment of the information, Landa and Rogers pleaded no contest to possession of concentrated cannabis (Health & Saf. Code, § 11357), and the court dismissed the other charges and remaining enhancement allegations on the People's motion. The court suspended imposition of sentence and placed Landa and Rogers on probation for 36 months.

Wolfe pleaded no contest to count 2, possession of marijuana for sale (Health & Saf. Code, § 11359), in exchange for dismissal of the remaining charge and enhancement

7

allegation. The court suspended imposition of sentence and placed Wolfe on probation for 36 months.

Defendants separately filed timely notices of appeal. The People filed an unopposed request to consolidate the appeals of Rogers, Landa, and Wolfe. On April 19, 2013, we granted the request to consolidate.

## DISCUSSION

### I. *Standard of Review*

The Fourth Amendment protects against unreasonable searches and seizures. (U.S. Const., 4th Amend.) Penal Code section 1538.5 allows a defendant to move to suppress evidence obtained in an improper seizure.[2]

Here, defendants filed a motion to suppress (§ 1538.5), which was heard and decided by Judge Gnoss at the preliminary hearing (see § 1538.5, subd. (f)(1)). A defendant may obtain appellate review of the denial of the motion in his or her postconviction appeal (§ 1538.5, subds. (f), (m)), even if, as here, there are guilty or no contest pleas. (§ 15538.5, subd. (m).) To obtain direct appellate review of the trial court's denial of a motion to suppress evidence under section 1538.5 at the preliminary hearing, a defendant must either renew the motion in the trial court or, as here, challenge the legality of the search in a motion to dismiss under section 995. (*People v. Lilienthal* (1978) 22 Cal.3d 891, 896.) " 'In a proceeding under section 995, the superior court's role is similar to that of an appellate court reviewing the sufficiency of the evidence to sustain a judgment. [Citation.] The superior court merely reviews the evidence; it does not substitute its judgment on the weight of the evidence nor does it resolve factual conflicts.' " (*People v. Magee* (2011) 194 Cal.App.4th 178, 182-183.)

When a motion to suppress evidence under section 1538.5 is denied at the preliminary hearing and reviewed by the trial court in a section 995 proceeding, we review the court's determination at the preliminary hearing, deferring to the court's factual findings. (*People v. McDonald* (2006) 137 Cal.App.4th 521, 529.) "We must

---

[2] All further unspecified code sections refer to the Penal Code.

draw all presumptions in favor of the magistrate's factual determinations, and we must uphold the magistrate's express or implied findings if they are supported by substantial evidence. [Citations.]" (*Ibid.*) Although we defer to the trial court's express or implied factual findings when they are supported by substantial evidence, we independently determine whether the search or seizure was reasonable under the Fourth Amendment on those facts. (*People v. Glaser* (1995) 11 Cal.4th 354.)

## II. *Officer Camara's Parking of His Vehicle in the Chevron Station*

Defendants contend that their Fourth Amendment rights were violated because Officer Camara unlawfully detained them, and therefore Judge Gnoss erred in denying their motion to suppress the marijuana seized. Defendants maintain that they were detained as soon as Camara arrived and parked his car in the gas station. At that point in time, Camara, according to defendants, did not have a reasonable suspicion of unlawful activity. The People respond that Camara's initial contact with defendants was a consensual encounter.

"Police contacts with individuals may be placed into three broad categories ranging from the least to the most intrusive: consensual encounters that result in no restraint of liberty whatsoever; detentions, which are seizures of an individual that are strictly limited in duration, scope, and purpose; and formal arrests or comparable restraints on an individual's liberty." (*In re Manuel G.* (1997) 16 Cal.4th 805, 821.) "Consensual encounters do not trigger Fourth Amendment scrutiny. [Citation.] Unlike detentions, they require no articulable suspicion that the person has committed or is about to commit a crime. [Citation.]" (*Ibid.*)

A detention does not occur when a police officer approaches an individual on the street and asks a few questions. (*Florida v. Bostick* (1991) 501 U.S. 429, 434.) "As long as a reasonable person would feel free to disregard the police and go about his or her business, the encounter is consensual and no reasonable suspicion is required on the part of the officer. Only when the officer, by means of physical force or show of authority, in some manner restrains the individual's liberty, does a seizure occur." (*In re Manuel G.*, *supra*, 16 Cal.4th at p. 821.) " '[I]n order to determine whether a particular encounter

9

constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.' [Citation.] This test assesses the coercive effect of police conduct as a whole, rather than emphasizing particular details of that conduct in isolation. [Citation.] Circumstances establishing a seizure might include any of the following: the presence of several officers, an officer's display of a weapon, some physical touching of the person, or the use of language or of a tone of voice indicating that compliance with the officer's request might be compelled. [Citations.] The officer's uncommunicated state of mind and the individual citizen's subjective belief are irrelevant in assessing whether a seizure triggering Fourth Amendment scrutiny has occurred. [Citation.]" (*Ibid.*)

In determining whether there has been a consensual encounter or the suspect has been detained, we must examine both an officer's verbal and non-verbal actions to assess "the coercive effect of police conduct as a whole . . . ." (*In re Manuel G.*, *supra*, 16 Cal.4th at p. 821.) An officer's "words and verbal tones are always considered," along with how an officer physically approaches the subject, or if the officer attempts to block the subject's path. (*People v. Garry* (2007) 156 Cal.App.4th 1100, 1110-1112.)

Here, Judge Gnoss did not find and the People do not argue that Camara had a reasonable articulable suspicion that defendants were or were about to be engaged in criminal activity when he first drove into the parking lot of the Chevron station. (See *Terry v. Ohio* (1968) 392 U.S. 1, 21.) The court's implied finding was that no detention occurred prior to Camara's drawing of his gun. Thus, the issue before us is whether Camara's initial contact, prior to the drawing of the gun, constituted a detention.

In the present case, Camara was in uniform, had a canine in his car, and was in a marked patrol car. He parked his car perpendicularly to defendants' vehicles and the "nose" of his vehicle "was just up about to the middle of the Jeep." Camara's vehicle was about 10 to 15 feet away from the Jeep and both Camara and Lucas testified that the Jeep had sufficient space to leave the parking lot. There was an empty parking space

10

next to the Jeep and Camara stated that "[t]here was plenty of room to get out." Camara also believed that the truck could exit the station. Simply parking near defendants' vehicles does not constitute a detention. (See *Perez, supra,* 211 Cal.App.3d at p. 1494 [no detention when officer "activated the high beams as well as the spotlights on both sides of the patrol car" and parked it "head on with defendant's vehicle" because "he left plenty of room for defendant to drive away"].)

Camara's other verbal and non-verbal actions, prior to drawing his gun, also support the conclusion that this was a consensual encounter. The record contains no evidence that Camara ever activated his emergency lights on his vehicle. Camara was the sole officer involved in the initial encounter. He did not have any verbal communication with defendants and did not physically touch them. Thus, we conclude that prior to Camara's drawing of his weapon, and after considering all of the circumstances, a reasonable person would have believed that he or she was "free 'to disregard [Camara] and go about his [or her] business.' " (*Florida v. Bostick, supra,* 501 U.S. at p. 434.)

Defendants maintain that the proximity of the officer's car, which was partially blocking their vehicles and not in a parking space, and the facts that Camara was in full uniform, had a canine in the car, and had a gun established that no reasonable person in defendants' positions would have felt free to leave. In describing Camara's initial encounter, Landa asserts that Camara "aggressively pulled up." Rogers states that Officer Camara "suddenly drove up in a marked patrol car" and "urgently drove up in full uniform with a gun," and Wolfe declares that Camara "suddenly arrived on the scene." Nothing in the record supports these claims that Camara "suddenly," "aggressively," or "urgently" appeared. The record is completely devoid of any evidence regarding the manner in which Camara's vehicle approached the gas station or when defendants spotted Camara.

Landa maintains that he was not free to leave because the record did not establish that he could have left in his pickup truck or that he could have walked away. Similarly, Wolfe maintains that the truck could not leave because it was next to the Jeep and would have had to back out of the space and veer sharply to the right to avoid hitting the police

11

car 10 to 15 feet behind it or the Jeep next to it. The record does not establish that the truck was completely blocked and, as already stressed, we interpret the evidence to support the trial court's findings. (See e.g., *People v. McDonald, supra,* 137 Cal.App.4th at p. 529.) Furthermore, Camara testified that he believed the pickup truck could have backed up around the police car.

The record also does not establish that Landa did not have space to walk away. Landa claims that he was not free to leave because he was standing between the Jeep and truck and the armed officer was in front of him. There is no evidence that Landa could not close the passenger doors and walk away or that he could not walk around the vehicles.

Wolfe and Landa also argue that Judge Gnoss erred because he believed that the ultimate issue was whether the Jeep physically had room to leave its parking space. They maintain that the trial court should have considered the objective test of whether a reasonable person would have believed that he or she could leave. In support of his argument, Landa cites the prosecutor's argument at the hearing that *Perez, supra,* 211 Cal.App.3d 1492 holds, according to the prosecutor, "[t]hat as long as there is—if a patrol car has partially blocked, but not completely, and there's room to get out, that that does not convert a consent to a detention." Subsequently, when ruling on the motion to suppress, Judge Gnoss noted that he reviewed *Perez* and agreed "that case does say that it's okay for an officer to park [his or her] vehicle in front of the defendant's vehicle, as long as there's room left for the defendant to leave." Judge Gnoss observed that the record supported a finding that there was sufficient room for the vehicles to leave and then denied the motion to suppress. Landa stresses that Judge Gnoss's ruling immediately after citing *Perez* establishes that he incorrectly relied on this sole factor.

As already noted, other objective circumstances support the trial court's conclusion that the initial encounter, prior to Camara's drawing of his weapon, was consensual and we may affirm the trial court's denial of the motion to suppress if it is "correct under any legal theory." (*People v. Hua* (2008) 158 Cal.App.4th 1027, 1033.) Furthermore, Judge Gnoss clearly considered these other factors. He mentioned that the

12

contact took place at 4:55 p.m. in the afternoon, while there was still daylight, while the gas station was still open, and in a public parking lot. Judge Gnoss noted that Camara was in uniform and had a gun on him but observed that Camara, the sole officer at the gas station, did not have any contact with defendants and did not verbally order them to do anything prior to drawing his weapon. He also stressed that the canine remained in the patrol car and was not part of the investigation.

Landa complains that the trial court did not address the manner of Camara's approach and the fact that he parked in the flow of traffic and limited defendants' ability to leave. He emphasizes that Camara did not park in an empty parking space. The record does not indicate that the police car was obstructing other traffic in the gas station. The record indicates only that the officer did not park in a parking space. Nothing in the record shows that there was anything aggressive in the manner in which Camara approached the gas station or in the way he parked his vehicle.

Defendants cite a number of cases, but these cases are unavailing. Rogers and Wolfe rely on *People v. Jones* (1991) 228 Cal.App.3d 519. In *Jones,* an officer spotted defendant standing on the sidewalk with two other men. The officer "suddenly" pulled his patrol car "to the wrong side of the road," parked it "diagonally against the traffic," got out, and told the defendant, who was walking away, to stop. (*Id.* at pp. 522-523.) When the defendant reached towards a pocket, the officer " 'grabbed his left forearm.' " (*Id.* at p. 522.) As the officer "withdrew [the defendant's] hand from the pocket," he saw a clear plastic bag containing what he suspected was cocaine. (*Ibid.*) The trial court granted the defendant's motion to suppress and the Court of Appeal affirmed because "[a] reasonable man does not believe he is free to leave when directed to stop by a police officer who has arrived suddenly and parked his car in such a way as to obstruct traffic." (*Id.* at p. 523.)

Here, in contrast to the officer in *People v. Jones, supra,* 228 Cal.App.3d 519, there is no evidence that Officer Camara "suddenly" parked his car in the gas station. He did not park against the traffic on the wrong side of the road, and did not make any verbal

13

commands to defendants. Camara did not touch defendants. *Jones* is not analogous to the present case.

Wolfe also relies on *People v. Bailey* (1985) 176 Cal.App.3d 402, *People v. Wilkins* (1986) 186 Cal.App.3d 804, and *United States v. Kerr* (9th Cir. 1987) 817 F.2d 1384. In each of these cases, the courts concluded there was a detention rather than a consensual encounter. In *Bailey,* the Sixth District held that the consent to the search was not voluntary because the officer pulled in behind the defendant's car and turned on his emergency lights. (*Bailey,* at p. 404.) The court explained, "A reasonable person to whom the red light from a vehicle is directed would be expected to recognize the signal to stop or otherwise be available to the officer." (*Id.* at pp. 405-406.) Here, in contrast, there is no evidence that Officer Camara activated his red light or any other light. *Wilkins* and *Kerr* are also clearly distinguishable from the present case. In both of the cases, the officers completely blocked the driver's freedom of movement. (*Wilkins,* at p. 807 [the officer "drove through the parking lot again . . . park[ing] diagonally behind the station wagon so that he was '. . . essentially blocking that exit' "]; *Kerr,* at p. 1387 [the officer pulled his marked patrol car into the defendant's one-lane driveway as the defendant was backing out, blocking the driveway].)

We conclude that the trial court properly denied defendants' motions to suppress evidence.

### III. *The Implied Finding that Camara Drew His Gun after Viewing the Marijuana*

Landa argues that a consideration of the entire record and "giving weight to the testimony of both Officer Camara and Detective Lucas, Officer Camara cannot have seen what he thought he saw, when he thought he saw it." He writes that Camara "may, honestly have believed that he saw the marijuana first, but this sequence of events was physically impossible and inherently improbable given the testimony of Detective Lucas." Landa concludes that the trial court's implied finding that Camara drew his gun after he saw the marijuana was "physically impossible and inherently improbable."

"To warrant the rejection by a reviewing court of statements given by a witness who has been believed by the trial court or the jury, there must exist either a physical

14

impossibility that they are true, or it must be such as to shock the moral sense of the court; it must be inherently improbable and such inherent improbability must plainly appear." (*People v. Ozene* (1972) 27 Cal.App.3d 905, 910, disapproved on another point in *People v. Gainer* (1977) 19 Cal.3d 835, 844, 851-852.) "Contradictions and inconsistencies alone will not necessarily constitute inherent improbability." (*People v. Swanson* (1962) 204 Cal.App.2d 169, 172.) "The trial judge and not this court resolves the inconsistencies and contradictions." (*Id.* at p. 173.)

Lucas testified that he saw Camara with his gun "[r]elatively quickly" after he was already "out of [his] vehicle." Lucas stated that he did not see "the drawing motion from the holster . . . ." Rather, Lucas "just saw [Camara's] arm extended out in the position[,] which could have either been him pointing or him holding a firearm in his hand, which is why I was questioning my partner." When asked whether Camara could have been drawing the gun as he left the vehicle, Landa responded, "I don't know." He added, "Again, I saw his hand extended out in this fashion (indicating), and that's after he was out of the vehicle, that's what I saw, was his hand." The court explained: "For the record, you had your right hand extended in an outward fashion."

Lucas further elaborated: "I saw [Camara] standing outside of his vehicle, and relatively quickly, not as soon as, like he stood, as soon as he stood up, he was like this (indicating). I saw him outside the vehicle. Then I saw his hand like this (indicating). I could have blinked. I could have not [seen] what happened. I don't know. But his hand was pointing outward." He added, "When I looked at him, he stepped out of the vehicle, then his hand was started pointing outward."

Landa argues that Camara admitted that he could not see the marijuana in the box until after he left his car and thus it was significant that Lucas saw Camara with his weapon pointed outward as soon as Camara was outside his vehicle. Given the position of the box, Landa asserts that it would have been impossible for Camara to have seen the marijuana before he was out of the vehicle and reached his standing height. He emphasizes that the box was 20 to 25 feet away, the bags of marijuana in the box were

15

lower than the edge of the flaps, and the box was between two vehicles parked side-by-side that had three passenger doors open.

Landa argues: "Given where the box was located, there was no way that Officer Camara could have seen the box of marijuana before drawing his weapon. It just could not have happened that way." Thus, he urges us to reverse, because the drawing of the gun constituted a detention prior to Camara's having any reasonable suspicion of criminality.

Our review of the record establishes that Camara testified that he saw a box behind the passenger door of the pickup truck while seated in his patrol car. He reported that he could not see what was inside the box while he was sitting in his car. He explained, "As I was getting out of my vehicle, I could see marijuana in open view there sitting in a cardboard box." He later agreed that he saw the marijuana in the box when he "got out of [his] vehicle and stood up . . . ." He declared that he saw the marijuana in the box underneath the door of the Jeep. Camara repeatedly testified that he did not pull his service handgun out until after he saw the box of marijuana, and estimated that he drew his gun one or two seconds after leaving his car.

Our independent review of the photographs does not support Landa's claim that it was *impossible* for Camara to have seen the marijuana as soon as he exited his car. Camara testified that he saw the box, but not the contents, while in his vehicle and thus it was reasonable for him to focus on what was inside of the box while exiting the car. This was especially true since Lucas had informed him that he suspected that the people at the gas station were involved in trafficking. The photograph of the box of marijuana establishes that the box was low to the ground and could be visible underneath the open doors on the vehicles. The flaps do not appear to make it impossible to view the bags of marijuana.

As already explained, it is the exclusive province of the trial court to determine the credibility of a witness and to resolve evidentiary inconsistencies. We *must* defer to the factfinder's credibility resolutions. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) "Except in . . . rare instances of demonstrable falsity, doubts about the credibility of the

16

in-court witness should be left for the" factfinder's resolution. (*People v Cudjo* (1993) 6 Cal.4th 585, 609.) " 'To warrant the rejection of the statements given by a witness who has been believed by a trial court, there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions.' [Citation.] Such cases are rare indeed." (*DiQuisto v. County of Santa Clara* (2010) 181 Cal.App.4th 236, 261.) Testimony may be rejected as inherently improbable or incredible only when the testimony is " ' "unbelievable *per se,*" ' physically impossible or " ' "wholly unacceptable to reasonable minds." ' [Citations.]" (*Oldham v. Kizer* (1991) 235 Cal.App.3d 1046, 1065.)

Landa has failed to demonstrate that Camara's testimony was inherently improbable or impossible. The trial court's finding was supported by Camara's testimony, alone, but we also disagree with Landa's argument that Lucas's testimony contradicted Camara's rendition of what happened. Lucas wrote in his report that Camara "immediately" drew his gun after he got out of his vehicle. At the hearing, Lucas repeatedly explained that he did not see when Camara drew his gun but insisted that Camara did not have his gun out until after he had exited the vehicle.

Accordingly, we conclude that substantial evidence supported the trial court's implied finding that Camara drew his gun after he spotted the marijuana in the box.

## DISPOSITION

The judgments are affirmed.

_____
Brick, J.*

We concur:


_____
Kline, P.J.


_____
Richman, J.


* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.